UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM CECERE IV,

                    Plaintiff,                 **AMENDED COMPLAINT**

vs.

                                        Civil No.: 24-cv-00155

CANISIUS UNIVERSITY F/K/A
CANISIUS COLLEGE and                **JURY TRIAL DEMANDED**
DR. AIMEE LARSON,
                    Defendants.
_____

       Plaintiff, WILLIAM CECERE IV, (hereinafter referred to as "Plaintiff"), in the above-entitled action, by and through his attorneys, Tiveron Law, PLLC, as and for his Complaint against Defendant, CANISIUS UNIVERSITY F/K/A CANISIUS COLLEGE (hereinafter referred to as "Canisius"), and DR. AIMEE LARSON (hereinafter "Dr. Larson"), states as follows:

       1.      That at all times hereinafter mentioned, Plaintiff, WILLIAM CECERE IV was and presently is a resident in the County of Erie, and State of New York.

       2.      That at all times hereinafter mentioned, Defendant Canisius was and presently is a resident of the County of Erie, and State of New York.

       3.      That at all times hereinafter mentioned, Defendant Dr. Larson was and presently is a resident of the County of Erie, and State of New York.

**<u>JURISDICTION AND VENUE</u>**

       4.      Jurisdiction is in the United States District Court pursuant to 18 U.S.C. §§ 1331 and 1343(a)(3) & (4) and 42 U.S.C. §§1983, 1985, 1986, the Constitution of the United States and the Court's supplemental (formerly pendent), and ancillary jurisdiction pursuant to 28 U.S.C. § 1367 for the Plaintiff's State claims herein.

5.      Plaintiff alleges that all causes of action emanate from a common nucleus of operative facts.

6.      Venue for this action is proper in the Western District of New York pursuant to 28 U.S.C. §1391(b)(1) because all Defendants reside within the District, and pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to the claims herein occurred within this District.

## RELEVANT HISTORY

7.      In 2020, Plaintiff was accepted into the Physician's Assistant program (hereinafter "PA program"), at Canisius.

8.      On October 20, 2020, all incoming students, including Plaintiff, received an email from Dr. Larson which informed them they did "not have to worry about registering for classes during their tenure with the program." Upon information and belief this communicated to the incoming students that the college would take care of registering them for classes and clinical rotations.

9.      Plaintiff believed he needed to receive his Hepatitis 1, 2, and 3 vaccinations as a requirement for attending Canisius. In December of 2021, Plaintiff went to General Physician's PC on Main Street in Buffalo, New York, for an appointment to get a Hepatitis vaccination.

10.     According to records at this appointment the Meningococcal vaccine was administered to Plaintiff's arm by a nurse.  Afterwards, Plaintiff went straight home and began to feel sick.

11.     Later that same night Plaintiff suffered excruciating pain all the way down his spine, the most severe type of pain he had ever experienced.

12.     During this time, Plaintiff was having difficulty breathing and was unable to move due to the debilitating pain.

13.     Plaintiff's mother gave him Benadryl, a purposeful choice in medication as Plaintiff had suffered an anaphylaxis reaction to Motrin (Ibuprofen) when he was little.

14.     Both of Plaintiff's parents have medical training and experience and they monitored him and told him to make sure he called his reaction into the Physician's Office first thing in the morning.

15.     This occurrence was prior to covid 19 vaccines and prior to covid vaccine mandates. Plaintiff still experiences pain in his spine years later with inability to properly manage his pain.

16.     On December 22, 2020, Plaintiff was still experiencing adverse side effects from the vaccination and contacted the General Physician PC's office who administered the vaccine.

17.     The following factual assertions detail multiple attempts made by Plaintiff to obtain his medical records involving his interaction with the General Physician's office on December 22, 2020.

18.     In order to complete the Physician's Assistant Program, all potential candidates must complete clinical rotations.

19.     These clinical rotations required candidates to have received the COVID-19 vaccination unless they were able to provide accepted medical or religious exemptions.

20.     Due to the severe reaction Plaintiff had previously experienced from receiving the meningococcal lipoprotein vaccination and Plaintiffs' medical history, Plaintiff intended to submit a medical exemption from the General Physician's P.C. office who had administered the prior vaccine and whom he consulted with when he experience the adverse reaction.

21.    Plaintiff met with the General Physician PC's office on Main Street in Buffalo, New York in September 2021 to obtain his medical records and the medical exemption for the COVID-19 vaccine.

22.    During this visit, he was advised by Ms. Katherine Sumner, a PA at the office, that she could not write him a medical exemption because she was fearful that she would lose her license if she did so.

23.    Upon information and belief, this was a shared fear among medical professionals that their licensure was at risk of being revoked by the government should they violate guidelines established because of the pandemic. These guidelines put pressure on medical professionals from state officials to encourage the general population to receive the COVID-19 vaccine and to continue to tout its safety.

24.    Plaintiff again attempted to retrieve his medical records and medical exemption from the General Physician PC's office, located on Main Street in Buffalo, on October 15, 2021. Plaintiff was again unsuccessful in this attempt.

25.    Shortly after this attempt, on October 22, 2021, Plaintiff was hassled by Dr. Larson, who insisted he needed to get a medical or religious exemption letter in order to continue his studies at Canisius.

26.    Plaintiff's mother, who is also his health care proxy, attempted to help Plaintiff obtain his necessary medical records. Plaintiff's mother visited the physician's office on October 27, 2021 and, after being treated poorly by office staff, was also unsuccessful in obtaining the records and left the office empty handed.

27.    Plaintiff again attempted to retrieve his records from the physician's office by written request on November 2, 2021. To date, Plaintiff has not received a response to that request.

28.     Plaintiff's mother is a D.D.S., having earned her dental degree from U.B. School of Dental Medicine. She witnessed the severe adverse reaction Plaintiff had to the Meningococcal Recombinant Lipoprotein vaccination in December 2020, and has witnessed other adverse reactions Plaintiff suffered in childhood from other vaccinations and medications.

29.     On November 7, 2021, Plaintiff's mother wrote a medical exemption letter for Plaintiff.

30.     Plaintiff was pressured by the administration at Canisius, insisting he needed to submit a letter advising whether he was going to take a leave of absence from the program, withdraw from the program or transfer. Upon information and belief Dr. Larson had previously told Plaintiff that there weren't any P.A. schools that had transfer options, leading Plaintiff to believe transferring was not an option.

31.     On November 15, 2021, Plaintiff was advised by school administration that if he was able to submit a medical or religious exemption from the COVID-19 vaccination he would not need to submit a letter seeking withdrawal, a leave of absence or deceleration in the program.

32.     On November 18, 2021, Plaintiff turned in his valid medical exemption letter to school administration.

33.     Despite its validity, Plaintiff's medical exemption letter was immediately rejected by the school administration, who deemed it a "conflict of interest" due to the fact that it was written by his mother.

34.     On November 19, 2021, Plaintiff turned in his valid religious exemption letter request to school administration.

35.     Plaintiff submitted a religious exemption letter from his priest, after which Donna Anderson contacted Plaintiff's priest on Defendants' behalf to "verify" the authenticity of Plaintiff's religious beliefs.

36.     Even after Plaintiff had submitted both a medical and a religious exemption letter, Canisius administration continued to pressure Plaintiff to submit a letter taking a leave of absence from the program.

37.     On November 22, 2021, after receiving Plaintiff's religious exemption letter, Dr. Larson sent Plaintiff an email at 3:20 p.m. pressuring him to send the same type of letter as previously requested. Plaintiff was confused because Dr. Larson had originally told him he would no longer need to submit a letter of intent once he had submitted an exemption letter. Plaintiff responded to Dr. Larson making it clear that he did not want to write a letter or take a leave of absence. Dr. Larson responded that he needed to meet with her in her office the next day.

38.     When Plaintiff met with Dr. Larson she continued to make efforts to induce Plaintiff to write a letter that would detrimentally affect his ability to continue the PA program.

39.     Plaintiff continued to insist that it was not his desire to take a leave of absence and he wished to proceed with his clinical rotations and to complete the program.

40.     In December 2021, while Plaintiff was meeting with his new primary care physician (Dr. Kevin Cleary), he was finally able to retrieve a copy of his medical records regarding his adverse reaction to the previously administered vaccine by General Physician PC. It was then that Plaintiff noted that his medical record was not an accurate description of his interaction that day and did not fully address the severe side effects he had experienced and was still experiencing.

41.     After reviewing Plaintiff's medical history, Plaintiff's primary care physician Dr. Kevin G. Cleary was able to write him a medical exemption letter.

42.    Plaintiff submitted the second medical exemption letter from his primary care physician to school administration in December 2021 at which time it was granted by Defendants.

43.    But then Plaintiff was advised by school administration that he would need to complete additional paperwork from Kaleida to complete the medical exemption process. This was the first time Plaintiff was advised there would be an additional requirement after submitting his medical exemption letter.

44.    Upon information and belief, Plaintiff's Physician's office received such frequent contact from Defendants that a nurse had to contact Plaintiff and ask him to tell the Defendants to stop calling them as it was a violation of HIPAA.

45.    Canisius refused to honor Plaintiff's medical exemption letter to allow him placement at clinical rotations.

46.    Upon information and belief, the dean of students Dr. Nancy Wallace reprimanded Plaintiff for not obtaining the vaccination. Upon information and belief, Dr. Wallace did not believe Plaintiff was unable to receive the vaccine, and offered to hook Plaintiff up to monitors and supervise the administration of the vaccine.

47.    Rather than attempt to arrange clinical sites for the Plaintiff, as they did for other students, Plaintiff was instructed to secure his own clinical sites.

48.    Plaintiff secured agreement from a number of clinical sites to have his medical exemption honored but was told it needed to proceed through Defendants. Upon information and belief, Defendants purposefully prevented Plaintiff from obtaining those sites and deliberately refused to allow those sites to accept his medical exemption.

49.     Defendants then decelerated Plaintiff in the program, asserting that Plaintiff's failure to provide clinical sites, an obligation defendants hold, prevented him from continuing in the program due to their failure to register Plaintiff in clinical rotations.

50.     On January 6, 2022 Plaintiff tested positive for COVID-19. Plaintiff provided school administration with the positive test results as well as positive COVID-19 antibody results, demonstrating he possessed the necessary antibody protection from the virus. Upon information and belief, possessing COVID-19 antibodies would allow Plaintiff to be placed at certain clinical rotation sites.

51.     Despite this information being provided to the school administration, they continued to pressure Plaintiff to submit a letter taking a leave of absence from the program and gave him a deadline of January 11, 2022 to do so.

52.     Defendant Larson told Plaintiff failure to submit the letter she was requesting would result in his dismissal.

53.     Plaintiff requested and received an extension of a few days to respond to this demand.

54.     Plaintiff wrote a leave of absence letter because Dr. Larson did not accommodate Plaintiff based on his medical and religious exemption letter, and threatened to dismiss Plaintiff from the program unless he wrote a leave of absence letter.

55.     Plaintiff, submitted a letter requesting a leave of absence, as a result of the school's refusal to register him for clinical rotations, along with a potential for immediate dismissal from the program should he fail to submit the letter.

56.     Plaintiff attempted to arrange clinical rotations out of state in states such as Florida and North Carolina where there was no vaccination mandate. Plaintiff also attempted to set up

clinical rotations with clinical sites in Buffalo, NY, using site provided personally by Dr. Larson, as well as virtual tele-medicine clinicals to meet his obligations.

57.     Plaintiff's attempts were blocked by Defendants who sent a cease and desist letter to Plaintiff's family who was attempting to assist Plaintiff. Upon information and belief, these actions were taken to prevent Plaintiff from obtaining clinical rotations.

58.     Upon information and belief, Defendants misrepresented to Plaintiff that the Physician Assistant Program at Canisius must complete their training within 42 months of matriculation as a requirement of the PA accrediting body. Upon investigation, Plaintiff discovered that there was no requirement under the accrediting body. Upon information and belief, Plaintiff was dismissed from the program based on this falsehood.

59.     On April 22, 2022, Plaintiff relinquished his leave of absence letter in front of the PA Program's "Board" and reiterated his desire to continue with the program. Upon information and belief, the Board placed Plaintiff back on a leave of absence without knowledge or consent of the Plaintiff.

60.     On September 9, 2022, Plaintiff sent a letter through counsel advising Defendants that he wished to renew his request to continue his studies with the Physician Assistant Program and begin his clinical placements. Plaintiff reiterated his willingness to attend out of state clinical rotations and/or via tele-medicine. Plaintiff also communicated that his medical exemption and natural immunity were sufficient to place him at various clinical locations.

61.     On December 22, 2022, Plaintiff sent out a letter through current counsel and requested Plaintiff's records regarding the actions in this Complaint. Shortly after Mr. Cohen's request, Plaintiff received a letter of dismissal from Canisius on December 29, 2022. This dismissal letter cited Plaintiff's failure to receive the COVID-19 vaccination, failure to obtain formal

medical exemptions for medical partners that could offer him clinical placements, failure to meet with the Didactic Education Coordinator or the Clinical Education Coordinator, failure to meet with the Program Director, and failure to attempt summative assessments to ensure clinical readiness as the reasons for Plaintiff's dismissal.

62.     After this letter, Plaintiff tried again around May 2023 to be readmitted to the Physician's Assistant Program so he could complete his education and obtain his degree. Plaintiff was informed by Defendants that he was not able to complete his clinical rotations prior to June 2024, the aforementioned 42-month requirement imposed by Canisius.

63.     Plaintiff's counsel reached out to the PA accreditation board asking about the 42-month requirement and was told that there was no such requirement. Upon confrontation with that information, Plaintiff was informed that it was a requirement imposed by Defendant Canisius.

64.     Defendants deliberately targeted Plaintiff and provided no academic support despite his medical exemption.

65.     Defendants refused to honor any attempt by Plaintiff to meet clinical demands by virtual or out of state clinics.

66.     Upon information and belief, Dr. Larson refused to secure clinical sites for the Plaintiff and actively took steps to prevent Plaintiff from securing his own clinical sites in order to meet the program requirements.

67.     Plaintiff has around 15 months of clinical work left to complete his P.A. degree which Defendants continue to refuse to set up for him, and no attempt has been made to reintegrate him into the program now that the medical pandemic and stringent vaccination requirements have lessened.

68.     Due to Defendant's actions, certain pre-requisite undergraduate courses that Plaintiff had previously completed prior to admission at Canisus have expired past the time requirement that PA schools require to be admitted. As a result, if Plaintiff were to seek entry into another PA Program, he would need to retake certain undergraduate courses to even be eligible for entry into requisite programs along with entrance exam, fees, and repeat all of his didactic education which he already completed since he graduated at the white coat ceremony.

## AS AND FOR A FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT

69.     Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

70.     Plaintiff and Defendant entered into an agreement when Plaintiff entered the PA program at Canisius.

71.     Plaintiff promised he would pay Canisius the requested tuition amount, and in return Canisius would provide the academic instruction and certification necessary to graduate.

72.     Plaintiff paid for his education, attended all of his classes, and passed all of his examinations with a GPA of 3.64, was in good academic standing, and was at the top of his class.

73.     Part of the agreement included a promise by Canisius that they would provide students with the clinical rotations required to graduate from the program.

74.     Defendant had an obligation as a school to connect Plaintiff with clinical programs so that he could complete the necessary clinical requirements to receive his degree and they failed to perform on their end of the contract when they did not connect him with clinical rotations.

75.     Defendant did not provide clinical rotations to Plaintiff as they had promised and were required to under the PA-ARC regulations and instructed Plaintiff he must find his own

clinical rotations in order to continue in the program. Defendant also took the steps outlined above to prevent Plaintiff from obtaining clinical sites that he attempted to set up for himself.

76.     Upon information and belief, two other students in Plaintiff's class were permitted to participate in telemedicine and/or out of state rotations to fulfill clinical rotations, but Plaintiff was not offered the opportunity of remote clinicals to account for his medical exemption and vaccination status.

77.     Plaintiff never intended to take a break from his instruction or write a leave of absence letter. Upon information and belief, Plaintiff was told by Defendant Larson that if he did not write a leave of absence letter by January 11, 2022, she would dismiss Plaintiff from the program.

78.     Defendant would not request or arrange Plaintiff's clinical rotations. As a result, Plaintiff was not able to set up any clinical rotations that had already been approved by Defendants, he was unable to complete his clinical requirements and thus, was dismissed from the program without receiving his degree.

79.     Upon information and belief, Plaintiff was able to arrange local clinical rotations that would meet 7 of the 10 required rotations. Defendants refused to consider these rotations and stated that because he could not arrange all 10, he would not be able to complete the clinical rotations he had arranged.

80.     Upon information and belief, the other three rotations could have been completed through telemedicine and out of state clinical sites. Upon information and belief, Plaintiff was under the impression that it was only his responsibility to arrange one clinical rotation in order to be reinstated to the program, not all 10.

81.     As a result of his dismissal, Plaintiff is unable to receive his PA degree which has limited his career options and earnings potential and caused him substantial economic damages. Plaintiff is unable to continue in another PA program without further economic damages due to the expiration of prerequisite undergraduate courses and repetition of other instruction he received at Canisius that is non-transferable. Additionally, Plaintiff paid tuition for which he never received the benefit of and spent time studying and paying living expenses that has had an economic impact and cost.

82.     The breach by Defendants Canisius and Dr. Larson included breaches of the covenants of good faith and fair dealing which are inherent in academic contracts of this nature.

83.     A contract was entered into between Plaintiff and Defendant Canisius and, by extension, Dr. Larson, its agent.

84.     Plaintiff upheld his end of the contract, performed, paid the tuition and did what was required of him.

85.     Defendants failed to live up to their obligations under the contract as stated herein.

86.     Defendants deliberately deprived Plaintiff of the opportunity to benefit from and complete performance of the contract and withheld benefits of the contract from Plaintiff.

87.     Plaintiff suffered damages, loss of time, loss of opportunities, loss of money and other damages as set forth herein.

**AS AND FOR A SECOND CAUSE OF ACTION:**
**DISCRIMINATION BASED ON DISABILITY PURSUANT TO 42 USCS § 12181, CH.**
**126, ET SEQ**

88.     Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

89.     Plaintiff had a disability within the meaning of the American's with Disabilities Act of 1990 ("ADA").

90.     A disability is defined as a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment.

91.     Plaintiff was disabled due to his inability to receive the COVID-19 vaccination.

92.     Defendant Canisius is considered a public accommodation as it is a postgraduate private school considered within the federal statute.

93.     Under 42 USCS § 12182, Defendants were prohibited from discriminating against Plaintiff on the basis of his disability.

94.     This can include, but is not limited to, denial of services, facilities, privileges, advantages or accommodations provided by a public accommodation.

95.     Defendants prevented Plaintiff from the equal and full enjoyment of the services, facilities, advantages, or accommodations that they provide when they failed to honor plaintiff's allergic reaction to the COVID-19 vaccination.

96.     Plaintiff received a valid medical exemption due to his inability to receive the COVID-19 vaccination that was granted by Defendants.

97.     Plaintiff was provided with a medical exemption letter by Dr. Kevin G. Cleary, M.D. on December 21, 2021. The exemption was granted by Dr. Kevin Cleary after a review of Plaintiff's medical history, which established prior severe allergic reactions to vaccines and medications and established an inability to obtain the COVID-19 vaccine without severe complications and unnecessary risks.

98.     Defendants accepted Plaintiff's medical exemption letter and were aware of Plaintiff's severe reactions to prior vaccinations and medications.

99.     Plaintiff was otherwise qualified to pursue his education and PA degree and perform his essential obligations as required by Canisius and the profession.

100.    Defendants failed to accommodate plaintiff under the meaning of the ADA.

101.    Defendants failed to make reasonable modifications in policies, practices, and procedures when the modification was necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities.

102.    Defendants denied the opportunity of clinical rotations to Plaintiff that they provided to other students of the institutions and was part of the services they offered to students of the institution.

103.    Defendants denied Plaintiff reasonable accommodations to account for his disability, including out of state clinical rotations, virtual tele-medicine, and other accommodations that could have been fashioned to allow Plaintiff to complete his clinical requirements while being unvaccinated.

104.    Defendants forced a plan onto Plaintiff that required him to receive the COVID-19 vaccination in violation of his disability, or gain "formal medical exemptions" from clinical

placements such as Kaleida Health, Catholic Health, Buffalo Medical Group, Primary care of WNY, ECMC, Trinity Health Partners.

105.    As a direct result of Plaintiff's disability and medical exemption, Defendants took adverse actions against Plaintiff including denial of services, refusal to accommodate, termination, refusal to allow Plaintiff to continue in program, and other adverse actions that prevented his graduation and conferring of his degree.

106.    Defendants denied Plaintiff's request to continue with his education multiple times and used an arbitrary time limitation to refuse to make reasonable accommodations for Plaintiff's disability and medical exemption.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

107.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

108.    Plaintiff and Defendant formed a contract where Plaintiff paid to attend the PA program at Canisius with the understanding that Defendant would supply him with the tools to receive his PA degree.

109.    The actions by Defendants outlined above had the effect of destroying Plaintiff's right to receive the fruits of the contract he had with Canisius. Specifically, Plaintiff was unable to obtain his PA degree and pursue his chosen occupation due to Defendant's actions.

110.    Defendants created an unfair duty not fairly inferable from the terms of the contract with Canisius by demanding Plaintiff secure his own clinical sites, an a demand that was not put upon his classmates.

111.    Defendants also encouraged Plaintiff to take a leave of absence even though he had a medical exemption that was granted by the Defendants themselves.

112.    Defendants sent Plaintiff and his family a "cease and desist" letter that was delivered to his house when Plaintiff's mother attempted to assist Plaintiff and arrange clinical rotations on his behalf.

113.    Even when Plaintiff was successful in initiating potential clinical rotations, his efforts were blocked by Defendants. Plaintiff was informed by some sites that in order to fully set up clinical rotations that Defendants must arrange them and they do not arrange them with students. Upon information and belief, the medical contacts Plaintiff reached out to were willing to help Plaintiff given his medical exemption but were blocked by the inaction/deliberate obstruction by the Defendants.

114.    Upon information and belief, Plaintiff followed Dr. Larson's instruction to obtain one clinical rotation, and upon securing it he sought to return to his instruction but was denied.

115.    As a result of Defendant's breach, Plaintiff did not have the means to complete the necessary obligations in order to receive his degree and therefore could not become a PA and lost out on his expected salary. Plaintiff will have to spend additional time and money which will require him to take undergraduate courses and repeat courses he has already done.

116.    Plaintiff had multiple interactions with those in charge of scheduling his clinicals, as well as attempting to schedule his own clinicals which were denied, all of which the school disregarded, making it impossible for him to complete the PA program's requirements.

## AS AND FOR A FOURTH CAUSE OF ACTION:
## CONTRACT PERFORMANCE INTERFERED WITH BY OUTSIDER

117.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

118.    Plaintiff and Defendant entered into an agreement when Plaintiff entered the PA program at Canisius and paid tuition.

119.    Dr. Larson was the Chair and Program Director of the PA program at Canisius.

120.    Dr. Larson was an outsider to the contract between Canisius and Plaintiff who acted outside the scope of her authority.

121.    Dr. Larson interfered with the agreement between Plaintiff and Canisius by refusing to connect Plaintiff with clinical sites, refusing to rescind his leave of absence, and refusing to work with him to solve his vaccination issue as a result of his medical exemption.

122.    Upon information and belief, Dr. Larson also coerced Plaintiff into taking a leave of absence from the program over his objections by threatening to immediately dismiss him from the program if he did not comply. These threats occurred after Plaintiff's medical exemption had been granted by Defendants.

123.    Dr. Larson was aware of the accreditation standards required to fulfill the PA-ARC requirements and took action to interfere with Plaintiff's ability to complete those requirements.

124.    Upon information and belief, Dr. Larson intended to prevent Plaintiff from participating in clinical rotations by requiring a medical exemption letter in order to be registered due to his unvaccinated status. Defendant Larson told Plaintiff that because he was not vaccinated, he could not take the next steps to graduate. When Plaintiff obtained another exemption letter from Dr. Kevin Cleary, MD, Dr. Larson told him this still did not qualify as a medical exemption letter.

125.    Plaintiff's medical exemption was eventually granted by Canisius. Despite his medical exemption, Dr. Larson refused to arrange clinical sites for the Plaintiff either outside of New York or in clinics that accepted medical exemptions.

126.    Plaintiff attempted to arrange these clinical sites himself as he had been instructed to by Dr. Larson. Plaintiff's mother called two programs provided to Plaintiff by Defendant Larson, to arrange clinical sites for the Plaintiff as Dr. Larson was refusing to assist. As a result of Plaintiff's mother's efforts, she was served with a legal threat that accused her of "falsely representing to health care providers in Western New York that [she] work[ed] in or are otherwise affiliated with Canisius's Physician Assistant Studies Program, and inquiring whether those professionals would offer clinical placements to the Program's students who have a medical exemption and/or COVID antibodies."

127.    In the same legal threat, Canisius claimed it was unable to find clinical placements for Plaintiff "solely because [Plaintiff] refuses to comply with the COVID-19 Vaccine Mandate."

128.    Upon information and belief, Dr. Larson also directed a police officer to arrest Plaintiff in front of his classmates. Upon information and belief, Plaintiff was told by the officer that Dr. Larson wanted Plaintiff in handcuffs but the officer refused to carry out that request. Dr. Larson also claimed that Plaintiff would not be graduating in front of all his classmates at the end of his first year of instruction.

129.    Upon information and belief, these actions were undertaken by Dr. Larson outside the scope of her duties to prevent Plaintiff from graduating and completing his contract with Canisius.

130.    Evidenced by the above, Dr. Larson intentionally and knowingly interfered with Plaintiff's contract with Canisus because as the Program Director she knew what Plaintiff's

obligations were in order to perform on his part of the contract and actively took steps to prevent Plaintiff being placed into clinical rotations.

131.    Because of Dr. Larson's third-party interference with Plaintiff's contract with Canisius, Plaintiff was unable to complete the necessary requirements to receive his PA degree and was dismissed from the program.

132.    As a result of his dismissal, Plaintiff is unable to receive his PA degree which has limited his career options and earnings potential. Plaintiff is unable to continue in another PA program without further economic damages due to the expiration of prerequisite undergraduate courses and repetition of all instruction he received at Canisus that is non-transferable. Additionally, Plaintiff paid tuition for which he never received the benefit of and spent time studying and paying living expenses that has had an economic impact and cost.

## AS AND FOR A FIFTH CAUSE OF ACTION: PROMISE CAUSING DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL

133.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

134.    Detrimental reliance arises from a promise made within the context of a contract, and the promisor fails to fulfill that promise.

135.    Equitable estoppel is a legal principle that prevents a party from asserting a right or defense that is contrary to their prior actions or representations, if allowing such assertion would unfairly harm another party who reasonably relied on those actions or representations.

136.    Defendant Canisius made a clear and unambiguous promise that it would provide Plaintiff the academic instruction and degree necessary to become a Physician's Assistant.

137.     Defendant Canisius also made a clear and unambiguous promise to Plaintiff that clinical rotations were provided and arranged for by Canisius and it was not the Plaintiff's responsibility.

138.     Defendant Dr. Larson promised Plaintiff in her official capacity that he was not in academic jeopardy and was in good standing at the time he took his leave of absence and that his "seat was saved" and he was "safe." Upon information and belief, these statements were intended to deceive Plaintiff and were planned to get Plaintiff to enter a leave of absence so they could dismiss him from the program despite his medical exemption.

139.     Plaintiff reasonably relied upon Defendants' promises that he would be provided with academic instruction and clinical rotations necessary to obtain his Physician's Assistant Degree.

140.      Plaintiff reasonably relied upon Defendant Larson's promises that his seat was saved and he was safe from dismissal if he took a leave of absence.

141.     Dr. Larson stated to Plaintiff that if he was able to arrange one rotation Defendants would sign him up.

142.     Additionally, Plaintiff detrimentally relied on Dr. Larson's clear and unambiguous representation that if he did not take a leave of absence he would be dismissed from the PA program.

143.     Plaintiff relied upon Defendants' promise that he would be able to continue in the program if he could set up one clinical rotation site. After Defendants secured Plaintiff's leave of absence letter, the promise was changed to "all 10 rotations sites" with no exceptions.

144.     Plaintiff was also promised by Defendants that he could return to the program at any time. Plaintiff withdrew his leave of absence and planned to continue the next semester but

was told by Dr. Scovazzo, an agent of Defendants, that they couldn't sign him up for rotations so they had put him back on a leave of absence. Defendants undertook these actions without Plaintiff's knowledge or consent, and Plaintiff was only made aware of this after he reached out.

145.    Defendants' promises created a reasonable foreseeability that Plaintiff would be able to return and complete the program once the mandate and clinical rotation limitations had been lifted.

146.    Defendants still possess the authority to permit Plaintiff to return to the program and complete his clinical rotations to obtain his degree but have arbitrarily refused to allow him to do so.

147.    In the end, Plaintiff's inability to complete his clinical rotations and his inability to be reinstated from his leave of absence led to his dismissal from the program despite his best efforts to fulfill every requirement and complete the program.

148.    As a result of reliance on Defendants' promises, Plaintiff is unable to receive his PA degree which has limited his career options and earnings potential. Plaintiff is unable to continue in another PA program without further economic damages due to the expiration of prerequisite undergraduate courses and repetition of other instruction he received at Canisius that is non-transferable. Additionally, Plaintiff paid tuition for which he never received the benefit of and spent time studying and paying living expenses that has had an economic impact and cost.

## AS AND FOR AN SIXTH CAUSE OF ACTION: QUASI CONTRACT/ UNJUST ENRICHMENT

149.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

150.    This quasi-contractual claim arose when Defendants received the benefit of tuition unjustly at the expense Plaintiff.

151.    Unjust Enrichment occurred when defendant received a benefit, plaintiff's tuition, at the expense of Plaintiff, and it would be unjust for the recipient to keep that benefit without compensating the other party, as he was denied the opportunity to complete his degree.

152.    Plaintiff performed on the contract with Canisius in good faith by paying tuition and attending all the required classes.

153.    Plaintiff was in good academic standing at the time he was coerced into taking a leave of absence due to his medical exemption and inability to receive the COVID-19 vaccination.

154.    Canisius was unjustly enriched when it profited off of Plaintiff's tuition but did not perform on its end of the contract by failing to provide Plaintiff with the necessary education to receive his PA degree.

155.    Defendants actively prevented Plaintiff from obtaining clinical rotations and refused to perform their obligations to secure clinical sites for the Plaintiff. Plaintiff has offered to continue his studies but Defendants have rejected an opportunity to perform under the contract.

156.    It would be against equity and good conscience to allow Defendants to keep Plaintiff's tuition money when they have not provided the performance that was contracted for.

157.    As a result, Plaintiff should recover all of his tuition money that was paid to Canisius.

### AS AND FOR A SEVENTH CAUSE OF ACTION:
### SPECIFIC PERFORMANCE

158.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

159.    Plaintiff and Canisius became parties to a contract when Plaintiff paid tuition to attend the PA program in order to receive his PA degree so he could obtain a PA license.

160.    This contract between Plaintiff and Defendant was valid and enforceable under the law.

161.    Defendants materially breached the contract when they failed to honor plaintiff's disability and disallowed him from finishing his degree.

162.    It is a matter for the court to determine if the request for specific performance is feasible, however, for the reasons outlined below, the possibility of specific performance is not unduly burdensome on Defendants.

163.    Plaintiff substantially performed on the contract by completing all assignments and examinations and remaining in good academic standing. Plaintiff also obtained a medical exemption that permitted him to continue in his clinical rotations.

164.    Plaintiff only needed to complete his clinical rotations and was willing and able to perform the remaining obligations under his contract in order to complete the PA program prior to and after his arbitrary dismissal.

165.    For equitable considerations this is a minor hardship for defendants, merely allowing him to finish his degree causes no great strain or expense on Defendants.

166.    Defendants have no regulations or limitations that prevent them from allowing Plaintiff to continue with his clinical rotations and obtain his degree.

167.    Plaintiff's damages are unique in character, as he cannot pursue another PA degree without additional investment of time and money into renewed undergraduate education and repetition of all instruction provided by Defendants.

168.    As a result, there is no adequate remedy at law that can provide Plaintiff with a PA degree and the ability to pursue his occupation of choice.

169.    Despite this difficulty, Plaintiff could complete his PA degree at Canisius within 15 months if he is provided clinical rotations which the Defendants are obligated to do under the accreditation standard.

170.    As a result, Plaintiff should be permitted to perform the remaining obligations of his instruction and clinical rotations and pursue his PA degree which he had contracted for with Defendants.

171.    Specific perform is the equitable remedy when monetary damages would be inadequate to remedy the breach of contract, and here no amount of monetary compensation would allow Plaintiff to be eligible for a suitable replacement program or get the time invested back.

## AS AND FOR AN EIGHTH CAUSE OF ACTION:
## NEGLIGENT MISREPRESENTATION CAUSING HARM

172.    Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

173.    Defendant Larson had a duty as a result of her administrative role to provide adequate instruction and guidance to Plaintiff to navigate the requirements of the PA program which created an obligation to provide Plaintiff with correct information.

174.    Defendants made multiple negligent misrepresentations which she should have known were incorrect.

175.    Plaintiff justifiably relied on theses false statements to their detriment, as Defendant Larson was in a position of power over Plaintiff.

176.    Plaintiff reliance on these statements caused harm in the form of being unable to complete the academic program and now being unable to pursue similar academic programs.

177.    These misrepresentations included telling Plaintiff he was not going to graduate, instructing Plaintiff he would be safe and his seat would be saved if he took a leave of absence, telling Plaintiff he was ineligible to participate in clinicals because of his vaccination status despite his medical exemption, telling him that there were no clinical rotations available, that he could not complete them out of state or through tele-medicine, that there was a 42-month time frame, that he could come back whenever he wanted to, and that he only needed to secure one clinical rotation to be reinstated to the program.

178.    Defendants had a duty of care to provide accurate information to Plaintiff in order to complete his academic program.

179.    Defendants knew that Plaintiff was relying upon these representations to navigate the completion of clinical rotations and assuring his graduation from the Physician Assistance Program.

180.    Plaintiff intended to rely on Defendants representations to assure that he could complete his clinical rotations and obtain his PA degree and certification.

181.    Plaintiff relied on Defendants' misrepresentations and took a leave of absence because he believed that he was unable to participate in clinical rotations, and therefore unable to graduate, in addition to a threat of immediate dismissal.

182.    As a result of Plaintiff's reliance on Defendants' misrepresentations, Plaintiff was dismissed from the PA program.

**AS AND FOR A NINTH CAUSE OF ACTION:**
**NEGLIGENT HIRING AND SUPERVISION/RESPONDEAT SUPERIOR**

183.     Plaintiff repeats, reiterates, and realleges all preceding paragraphs, inclusive, and by this reference incorporates the allegations contained therein with the same force and effect as if forth fully set forth herein.

184.     Defendant owed a duty of care to its students to ensure that employees are reasonably fit, competent, and safe to perform their job duties.

185.     Defendant breached this duty by failing to exercise reasonable care in hiring, training, or supervising the employee, specifically, Dr. Larson.

186.     Dr. Larson is an employee of Canisius and, in furtherance of her duties owed to Canisius and within the scope of her employment, she induced Plaintiff to take a leave of absence, barring him from completing his clinical rotations and requirements of the PA program.

187.     Defendant's breach of duty is the proximate cause of the harm suffered by Plaintiff, as taking a leave of absence was fatal to him completing the PA program.

188.     Canisius is responsible for Dr. Larson's actions and has the authority as her employer to exercise control over her activities, which they failed to do.

189.     Additionally, Dr. Larson was wholly acting within the scope of her employment when she induced Plaintiff to take a leave of absence to his detriment.

190.     Dr. Larson's actions were the direct cause of the Plaintiff being unable to complete his PA program.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount which exceeds the jurisdictional limits of all lower courts which might otherwise have jurisdiction, and for such other and further relief to Plaintiff as this Court deems just and proper.

Dated:  Amherst, New York
        April 8, 2024

_____
Steven M. Cohen, Esq.
**Tiveron Law, PLLC**
*Attorneys for Plaintiff*
2401 North Forest Road, Suite 301
Amherst, New York 14068
scohen@tiveronlaw.com